UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re:

          Advanced Chimney, Inc

                                 Debtor

------------------------------------------------------------x

Case No. 14-73667 (AST)

Chapter 11

## AMENDED DISCLOSURE STATEMENT

## I. INTRODUCTION

Advanced Chimney, Inc. (the "Debtor"), the above-referenced debtor and debtor-in-possession, submits this disclosure statement (the "Disclosure Statement") pursuant to §1125 of title 11, United States Bankruptcy Code (the "Bankruptcy Code"). This Disclosure Statement contained information about the Debtor and describes the Debtor's Amended Plan of Reorganization, dated June 3, 2015 (the "Plan"),[1] filed with the United States Bankruptcy Court, Eastern District of New York (the "Court"), and annexed hereto as **Exhibit A**.

The proposed distributions under the Plan are discussed under Section III of this Disclosure Statement. General unsecured creditors are classified as Class 3, and will receive a distribution of eighteen (18%) percent of their allowed, to be distributed as follows: (1) three (3%) percent on the effective date of the Plan; and (2) three (3%) percent every twelve (12) months thereafter for a period of five (5) years.[2]

### A. Purpose of this Document

This Disclosure Statement describes:

- The Debtor and significant events during the bankruptcy case.
- How the Plan proposes to treat claims or equity interests of the type you hold (i.e., what you will receive on your claim or equity interest if the Plan is confirmed).
- Who can vote on or object to the Plan.
- What factors the Court will consider when deciding whether to confirm the Plan.
- Why the Debtor believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation.
- The effect of confirmation of the Plan.

---

[1] Capitalized terms used but not herein defined shall have the meanings ascribed in the Plan.

[2] The current eighteen (18%) percent distribution is based on the current structure of classes. If holders of claims in other classes choose to opt into the pool of general unsecured claims, the eighteen (18%) percent will be proportionally reduced based on the increased amount of all claims in the pool of general unsecured claims.

Be sure to read the Plan as well as the Disclosure Statement. This Disclosure Statement describes the Plan, but it is the Plain itself that will, if confirmed, establish your rights.

### B. Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes the procedures pursuant to which the Plan will or will not be confirmed.

1. *Hearing to Approve this Disclosure Statement and Confirm the Plan*

The hearing at which the Court will determine whether to approve this Disclosure Statement and confirm the Plan will take place before the Honorable Alan S. Trust, United States Bankruptcy Judge, Eastern District of New York, at the Courthouse located at 290 Federal Plaza, Central Islip, New York, Room 960, on June 17, 2015 at 11:00 a.m.

2. *Deadline for Voting to Accept or Reject the Plan*

If you are entitled to vote to accept or reject the Plan, vote on the enclosed ballot and return the ballot to Macco & Stern, LLP, 135 Pinelawn Road, Suite 120 South, Melville, NY 11747, Attn: Cooper J Macco, Esq. See Section IV.A., below, for a discussion of voting eligibility requirements.

3. *Deadline for Objecting to the Adequacy of the Disclosure Statement and Confirmation of the Plan*

Objections to this Disclosure Statement or to the confirmation of the Plan must be filed with the Court and served upon Macco & Stern, LLP and the Debtor by June 10, 2015 at 4:00 p.m.

4. *Identity of Person to Contact for More Information*

If you want additional information about the Plan, you should contact Debtor's counsel, Macco & Stern, LLP, 135 Pinelawn Road, Suite 120 South, Melville, NY 11747, Attn: Cooper J Macco, Esq., (631) 549-7900.

### C. Disclaimer

*The Court had conditionally approved this Disclosure Statement as containing adequate information to enable parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted. The Court's approval of this Disclosure Statement is subject to final approval at the hearing on confirmation of the plan. Objections to the adequacy of this Disclosure Statement may be filed until June 10, 2015.*

## II. BACKGROUND

### A. Description and History of the Debtor's Business

In or about December 1998, the Debtor was formed under the laws of the State of New York with the purposed of performing chimney sweep and repair work. The Debtor operated successful for a period. In August 2005, the New York State Department of Taxation and Finance and subsequent settlement forced the Debtor to voluntary petition for relief under chapter 11 of the Bankruptcy Code in August 2008, assigned case number 08-74464 (AST). The Debtor successfully reorganized and emerged from Bankruptcy in September 2009. The Debtor made all payments and successfully completed the Chapter 11 proceeding. Since that time, the Debtor has continued to operate as a chimney sweep and chimney repair company.

### B. Insiders of the Debtor

The Debtor is managed by its sole shareholder, Michael Steeneck who is also an officer and director of the Debtor. His compensation for the past two (2) years was as follows: (1) $70,700 for 2013; and (2) $40,775 for 2014. Historically, Mr. Steeneck was paid substantially more than $70,000. However, due to the cost of legal services associated with the Graziano Lawsuit, as well as a downturn in business, Mr. Steeneck has reduced his income.

### C. Management of the Debtor Before and During the Bankruptcy

Mr. Steeneck operated the Debtor prior to its filing of a petition for relief under chapter 11 of the Bankruptcy Code. Mr. Steeneck continues to manage the Debtor during the pendency of its case.

After confirmation of the Plan, Mr. Steeneck will continue to manage the Debtor.

### D. Events Leading to Chapter 11 Filing

Prior to the commencement of this case, the Debtor purportedly purchased liability insurance from its commercial insurance broker, Kimberly A. Graziano (the "Graziano") through her insurance brokerage, K.A.G Insurance Brokerage Inc. ("KAG"). It connection with its insurance policy, the Debtor also received an insurance binder from Graziano and/or KAG, bearing policy number NPP80000194, with Tudor Insurance Company ("Tudor").

Thereafter, Debtor submitted several claims to Tudor. Tudor disputed that the Debtor was actually insured at the time of the events that led to the Insurance Litigations (defined below). In light of the foregoing, the Debtor made a claim on Graziano and KAG's, errors and omissions insurance policy, carried by U.S. Underwriters Insurance Company, assigned policy no. 1AE3010577F. Moreover, Tudor informed the Debtor that it was the victim of fraud, perpetrated by Graziano through KAG. In response, the Debtors filed a lawsuit against, *inter alia,* Graziano, KAG, and Tudor, in the Supreme Court of the State of New York, County of Suffolk, assigned index number 23909/2012 (the "Graziano Lawsuit"). The Debtor is not pursuing relief in the Graziano Lawsuit other than seeking to pay the parties who were alleged damaged by the Debtor's negligence, including holders of the Insurance Claims (defined below), from any recovery. Accordingly, the Graziano Lawsuit will not benefit the Debtor's estate other

3

than determining liability against Graziano, KAG and/or Tudor for the Insurance Claims. The State Court should apportion the percentage of liability and amount of relief to each of the defendants in the Graziano Lawsuit and Insurance Lawsuits.

On or about February 24, 2011, an alleged fire occurred at a building located at 408 East 73rd Street, New York, New York. 408 East 73 Street Housing Corporation ("408 Corp.") alleges that the fire occurred due to the Debtor's negligence in performing work on a chimney system. Greater New York Mutual Insurance Company ("GNY"), as subrogee of 408 Corp., commenced an action against the Debtor in the Supreme Court of the State of New York, County of New York, assigned index number 111190/2011 (the "408 Lawsuit"). Thereafter, the Debtors requested the 408 Lawsuit be transferred to Suffolk County and consolidated with the Graziano Lawsuit. The Court ordered the transfer of the 408 Lawsuit, and assigned it index number 016433/2013. In connection with the 408 Lawsuit, GNY filed a proof of claim in the Debtor's bankruptcy case, assigned claim number 8 ("Claim No. 8"), in the general unsecured amount of $157,159.43.

On or about June 1, 2011, an alleged fire, smoke, and/or soot condition occurred at the premises located at 20 Maplewood Road, Hartsdale, New York, owned by Wanda D. Queen ("Queen"). Queen alleges that the fire, smoke, and/or soot condition occurred due to the Debtor's negligence in servicing, maintaining, and/or repairing the chimney located at the premises. Liberty Mutual Insurance Company ("Liberty"), as subrogee of Queen, commenced an action against the Debtor in the Supreme Court of the State of New York, County of Westchester, assigned index number 51701/2014 (the "Queen Lawsuit"). In connection with the Queen Lawsuit, Liberty filed a proof of claim in the Debtor's bankruptcy case, assigned claim number 2 ("Claim No. 2"), in the general unsecured amount of $69,329.74.

On or about November 5, 2011, an alleged fire occurred at the premises located at 60 Marlboro Road, Valley Stream, New York, owned by Suzanne Agurkis ("Agurkis"). Agurkis alleges that the fire occurred due to the Debtor's negligence in performing work, including, but not limited to, the installation of a new firebox, a new ash trap and repairs and replacement as needed to the masonry associated with the chimney of her premises. State Farm Fire and Casualty Insurance Company ("State Farm"), as subrogee of Agurkis, commenced an action against the Debtor in the United States District Court for the Eastern District of New York, assigned index number CV-13-4608 (the "Agurkis Lawsuit"). In connection with the Agurkis Lawsuit, State Farm filed a proof of claim in the Debtor's bankruptcy case, assigned claim number 3 ("Claim No. 3"), in the general unsecured amount of $173,845.55.

On or about January 1, 2013, an alleged fire occurred at the premises located at 30 Soluri Lane, Tompkins Cove, New York, owned by Josep Macario ("Maracio"). Macario alleges that the fire occurred due to the Debtor's negligence in performing work on a chimney system. Allstate Indemnity Company ("Allstate"), as subrogee of Macario, commenced an action against the Debtor in the Supreme Court of the State of New York, County of Rockland, assigned index nuber 030697/2015 (the "Macario Lawsuit"). Upon information and belief, Allstate is entitled to file a proof of claim in the Debtor's bankruptcy case (the "Macario Claim").

On or about January 27, 2011, an alleged fire, smoke, and/or soot condition occurred at the premises located at 735 Decatur Street, Brooklyn, New York, owned by Stevan Sherman

("Sherman"). Sherman alleges that the fire, smoke, and/or soot condition occurred due to the Debtor's negligence in servicing, maintaining, and/or repairing the chimney. State Farm, as subrogee of Sherman, commenced an action against the Debtor in the Supreme Court of the State of New York, County of Kings, assigned index number 17787/2013 (the "Sherman Lawsuit"). Upon information and belief, State Farm is entitled to file a proof of claim in the Debtor's bankruptcy case (the "Sherman Claim").

On or about November 14, 2012, an alleged smoke, and/or soot condition occurred at the premises located at 13 South 12th Avenue, Mount Vernon, New York, owned by Midgalia Rivera ("Rivera"). Rivera alleges that the smoke and/or soot condition occurred due to the Debtor's negligence in servicing, maintaining, and/or repairing the chimney located at the premises. Castlepoint Insurance Company ("Castlepoint"), as subrogee of Rivera, commenced an action against the Debtor in the Supreme Court of the State of New York, County of New York, assigned index number 151688/2014 (the "Rivera Lawsuit," and together with the 408 Lawsuit, the Queen Lawsuit, the Agurkis Lawsuit, and the Sherman Lawsuit, the "Insurance Litigations"). In connection with the Rivera Lawsuit, Castlepoint filed a proof of claim in the Debtor's bankruptcy case, assigned claim number 1 ("Claim No. 1," and together with Claim Nos. 2, 3, 8, the Macario Claim, and the Sherman Claim, the "Insurance Claims"), in the general unsecured amount of $6,635.04.

On or about November 20, 2013, the Debtor's employee, Douglas Derksen, was involved in a motor vehicle accident while driving a Debtor owned vehicle, with Faroud Neezamooden ("Faroud"). In connection with the car accident, Faroud commenced a personal injury lawsuit against the Debtor in the Supreme Court of the State of New York, County of Kings, assigned index number 501851/2014 (the "Faroud Lawsuit"). The Debtor, through their motor vehicle insurance carrier, Progressive Casualty Insurance Company ("Progressive") is defending this action. In connection with the Faroud Lawsuit, Faroud filed a proof of claim in the Debtor's bankruptcy case, assigned claim number 9 (the "Faroud Claim"), in an undetermined amount.

A plaintiff in one of the Insurance Litigations refused to wait for the outcome of the Graziano Lawsuit before obtaining a judgment against the Debtors. Accordingly, the Debtors are seeking to retain special counsel to continue the Graziano Lawsuit, as well as interplead the plaintiff's in the Insurance Litigations. This will allow the plaintiffs in the Insurance Litigations to continue their Insurance Litigations against the Debtor, while the Debtor seeks to assign liability through the Graziano Lawsuit. It is the Debtor's intent that all of the creditors who have liability claims based on the Debtor's purported negligence, including, but not limited to, the plaintiffs in the Insurance Litigations, will be impleaded into the Graziano Lawsuit to determine liability as against Graziano, KAG, and Tudor, and will be paid out of available proceeds.

Since the Petition Date, the Graziano Lawsuit, the Faroud Lawsuit, and the Insurance Lawsuits, as against the Debtor, have not been pursued. However, upon information and belief, upon the confirmation of the Plan, the Debtors anticipate that all of the pending lawsuits will continue normally.

### E. Significant Events During the Case

On August 7, 2014 (the "Petition Date") the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is authorized to operate as a debtor-in-possession under Bankruptcy Code §§1108 and 1109. To date, the Office of the United States Trustee (the "UST") has not appointed a chapter 11 trustee or examiner, nor has an official committee of unsecured creditors been formed.

### F. Projected Recovery of Avoidable Transfers

The Debtor has reviewed its books and records and the Debtor does not intend to pursue preference, fraudulent conveyance, or other avoidance actions, insofar as it believes they now exist.

### G. Claims Objections

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims.

All claims in Class 1 and 2 shall have the amounts fixed for voting purposes in the amount of their filed proofs of claim.

Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in Article V of the Plan.

### H. Current and Historical Financial Conditions

The identity and fair market value of the Debtor's assets are listed in **Exhibit B** and the valuation of those assets as determined by the Debtor is also set forth. In addition, the estimated liquidation value at the outset is also set forth in **Exhibit B.**

The Debtor's pre-Petition Date 2014 Profit and Loss Statement are set forth in **Exhibit C.** The Debtor has filed monthly operating reports with the Court. The Debtor's most recent operating report is annexed hereto as **Exhibit D**. The Debtor financial projections are set forth on **Exhibit E.**

## III. SUMMARY OF PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND SECURITY INTERESTS

### A. Purpose of the Plan of Reorganization

As required by the Bankruptcy Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

**B. Unclassified Claims**

Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan Proponent has *not* placed the following claims in any class:

1. *Administrative Expenses*

Administrative expenses are costs or expenses of administering the debtor's Chapter 11 case which are allowed under Section 507(a)(2) of the Code. The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists the Debtor's estimated administrative expenses and their treatment under the Plan.

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses Arising in the Ordinary Course of Business After the Petition Date | $0.00 | Paid in full on the effective date of the Plan, or according to terms of obligation if later |
| The Value of Goods Received in the Ordinary Course | $0.00 | Paid in full on the effective date of the Plan, or according to terms of obligation if later |
| Professional Fees, as approved by the Court | $40,000.00 | Paid in full on the effective date of the Plan, or according to separate written agreement, or according to Court order if such fees have not been approved by the Court on the effective date of the Plan |
| Clerk's Office Fees | $0.00 | Paid in full on the effective date of the Plan |
| Other administrative expenses | $0.00 | Paid in full on the effective date of the Plan or according to separate written agreement |
| Office of the U.S. Trustee Fees | $0.00 | Paid in full on the effective date of the Plan |
| **TOTAL** | **$40,000.00** | |

2. *Priority Tax Claims*

Priority tax claims are unsecured income, employment, and other taxes described by Bankruptcy Code §507(a)(8) of the Code. Unless the holder of such a §507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the order of relief.

The Debtor has no priority tax claims.

### C. Classes of Claims and Equity Interests

1. *Classes of Secured Claims*

Allowed Secured Claims are claims allowed by property of the Debtor's bankruptcy estate (or subject to setoff) to the extent allowed as secured claims arising under Bankruptcy Code §506. If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be a general unsecured claim.

The Debtor has no secured claims.

2. *Classes of Priority Unsecured Claims*

Certain priority claims that are referred to in Bankruptcy Code §§507(a)(1), (4), (5), (6), and (7) of are required to be placed in classes. The Code requires that each holder of such claim receive cash on the effective date of the Plan equal to the allowed amount of such claim. However, a class of holders of such claims may vote to accept different treatment.

The Debtor has no priority unsecured claims.

3. *Classes of General Unsecured Claims*

General unsecured claims are not secured by property of the estate and are not entitled to priority under Bankruptcy Code §507(a).

The following chart identifies the Plan's proposed treatment of Classes 1 through 3, which contain general unsecured claims against the Debtor.

| Class Number | Description | Impairment | Treatment |
|:---:|:---:|:---:|:---|
| 1 | Faroud Claim | Impaired | By operation of law, lift the automatic stay pursuant to Bankruptcy Code §362 to pursue State Court litigation to the extent of the automobile insurance proceeds. Alternatively, holders of claims in Class 1 can chose to opt-in to treatment as a general unsecured creditor of Class 3 on the ballot. |
| 2 | Insurance Claims | Impaired | By operation of law, lift the automatic stay pursuant to Bankruptcy Code §362 to pursue State Court litigation as to liability against Kimberly A. Graziano (the "Graziano") through her insurance brokerage, K.A.G Insurance Brokerage, Inc. ("KAG"), to the extent of (1) the errors and omissions insurance policy,, carried by U.S. Underwriters Insurance |

8

| | | | |
|---|---|---|---|
| | | | Company, assigned policy no. 1AE3010577F, in the amount of $1,000,000 per claim and $2,000,000 in the annual aggregate, (2) the insurance policy with Tudor, or (3) any other insurance policy covering the acts of Graziano and KAG. Alternatively, holders of claims in Class 2 can chose to opt-in to treatment as a general unsecured creditor of Class 3 on the ballot. |
| 3 | General Unsecured Claims | Impaired | Receive a distribution of eighteen (18%) percent of their allowed claim, to be distributed as follows: (1) three (3%) percent on the effective date of the Plan; and (2) three (3%) percent every twelve (12) months thereafter for a period of five (5) years. If any or all holders of claims in Class 1 and Class 2 chose to opt in to Class 3, the claim against the Debtor will be contemporaneously allowed and added to Class 3 by the stipulation of dismissal. The Debtor reserves the right to object to the amount of such claim. The current eighteen (18%) percent distribution that all holders of claims in Class 3 will be proportionally reduced based on the increased amount of all claims of Class 3. |

Class 1 consists of the Faroud Claim. Since the Faroud Claim is the subject of the pending Faroud Lawsuit, the Debtors propose that the Faroud Claim is not substantially similar to any other claims or interest. Particularly, the Faroud Claim may be repaid from an independent source not associated with the Debtor's bankruptcy, i.e.: the automobile insurance policy.

Class 2 consists of the Insurance Claims. Since the Insurance Claims are the subject of the pending Insurance Lawsuits, as well as being impleaded into the Graziano Lawsuit, the Debtors propose that the Insurance Claims are not substantially similar to any other claims or interest. Particularly, the Insurance Claims may be repaid from an independent source not associated with the Debtor's bankruptcy, i.e.: the errors and omissions policy of Graziano and KAG, and/or Tudor Insurance.

Where there is evidence that there is another, nondebtor source of repayment of debt, such debt must be separately classified. *See In re Loop 76 LLC*, 442 B,R, 713 (Bankr. D. Ariz. 2010); *Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 323 (9th Cir. 1994). Thus, as debts that may be repaid from nondebtor sources, the Faroud Claim and the Insurance Claims must be

placed in different classes from each other, as well as different classes from other general unsecured creditors.

Although the Debtors believe that the proposed treatment of the Faroud Claim and the Insurance Claims is more beneficial than the treatment of Class 3, the general unsecured creditors, any holder of a claim for Class 1 or Class 2 can chose to opt out and be treated a holder of a Class 3 general unsecured creditor by executing a stipulation of dismissal of their lawsuit against the Debtor prior to the confirmation of the Plan. By not opting out of Class 1 or Class 2, the claim holders are limiting their potential recovery based on the outcome of their lawsuit and to the extent of the insurance proceeds, if any.

Holders of claims in Class 1 and Class 2 are creditors of the Debtors. If they did not have recourse against the insurance policies, they would be paid as a general unsecured creditor. However, since the Debtor is only one of many defendants in the Faroud Lawsuit and Insurance Lawsuits, fixing of their claim amount would have an effect on to all parties involved in such litigation. A determination as to liability against the Debtor by the allowance of the claim may have unforeseen consequences. Accordingly, out of abundance of caution, the Debtors seek to permit the holders of claims in Class 1 and Class 2 to pursue their lawsuits, but eliminate any recovery for liability over and above such insurance limits. Accordingly, their claims are impaired.

If the holder of claims in Class 1 and Class 2 chose to opt in to Class 3, the claim against the Debtor will be contemporaneously allowed and added to Class 3 by the stipulation of dismissal. The Debtor reserves the right to object to the amount of such claim. The current eighteen (18%) percent distribution that all holders of claims in Class 3 will be proportionally reduced based on the increased amount of all claims of Class 3.

4. *Classes of Equity Interest Holders*

Equity interest holders are parties who hold an ownership interest (i.e., equity interest) in the Debtor. In a corporation, entities holding preferred or common stock are equity interest holders.

The following chart sets forth the Plan's proposed treatment of the class of equity interest holders:

| Class Number | Description | Impairment | Treatment |
|:---:|:---:|:---:|:---|
| 4 | Michael Steeneck | Impaired | New shares will be issued to Mr. Steeneck upon confirmation of the Plan. |

## D. Means of Implementing the Plan

Payments and distributions under the Plan will be funded by the Debtor's post-petition operations. It is estimated that the Debtor needs $40,000.00 for professionals' fees, plus a

distribution to allowed general unsecured creditors of $4,662.03, upon confirmation. Based upon its operations, the Debtor can make payments under the Plan.

### E. Post-Confirmation Management

The post-confirmation managers of the Debtor, and their annual compensation, shall be as follows:

| Name | Insider | Position | Compensation |
|---|---|---|---|
| Michael Steeneck | Yes | President | $70,000.00 |

### F. Risk Factors

The proposed Plan has the following risks: if the Debtor is unable to make payments from the successful operation of its business, the management would have to consider closing the business and liquidating the company by means of filing a voluntary petition under Chapter 7 of the Bankruptcy Code.

### G. Executory Contracts and Unexpired Leases

The Debtor is a triple net month-to-month tenant of 710-1 Union Parkway, Unit 25, Ronkonkoma, New York 11779, which is leases from Bare Bones Realty LLC (the "Landlord"). The Debtor is current on all pre-petition and post-petition rent payments to the Landlord. There is no written lease to assume, but the Debtor will continue to remain at the premises and make monthly rental payments. The Landlord is owned and operated by the father of Mr. Steeneck.

Upon information and belief, there are no executory contracts or unexpired leases. However, out of an abundance of caution, to the extent such executory contracts and unexpired leases exist, the other executory contracts and unexpired leases will be rejected under the Plan. Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

### H. Tax Consequences

*Creditors and equity interest holders concerned with how the plan may affect their tax liability should consult with their own accountants, attorneys, and/or advisors.*

The Plan proponent has not researched the Federal Income Tax consequences of the Plan for holders of claims and interest based upon the Internal Revenue Code, the Treasury Regulations promulgated thereunder, traditional authority, and current administrative rules and practice. The Plan proponent has not requested a ruling from the Internal Revenue Service with respect to these matters. Accordingly, no assurance can be given to the interpretation by the Internal Revenue Service. Further, the Federal Income Tax consequences to any particular

claimant or interest holder may be affected by matters not discussed herein.  There also may be state, local or foreign tax considerations applicable to each claimant or holder of an interest.

## IV. CONFIRMATION REQUIREMENTS AND PROCEDURES

To be confirmable, the Plan must meet the requirements listed in Bankruptcy Code §§1129(a) or (b). These include the requirements that: (1) the Plan must be proposed in good faith; (2) at least one impaired class of claims must accept the Plan, without counting votes of insiders; (3) the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a Chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and (4) the Plan must be feasible. These requirements are not the only requirements listed in Bankruptcy Code §1129, and they are not the only requirements for confirmation.

### A.  Who May Vote or Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

Many parties in interest, however, are not entitled to vote to accept or reject the Plan.

A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan proponent believes that class 1, 2, and 3 are impaired and that holders of claims in this class is therefore entitled to vote to accept or reject the plan. All claims in Class 1 and 2 shall have the amounts fixed for voting purposes in the amount of their filed proofs of claim.

The Plan Proponent believes that Class 4 equity interest holders are insiders and therefore do not have the right to vote to accept or reject the plan.

### 1.  *What is an Allowed Claim or an Allowed Equity Interest*

Only a creditor or equity interest holder with an allowed claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either: (1) the Debtor has scheduled the claim on the Debtor's schedules, unless the claim has been scheduled as disputed, contingent, or unliquidated; or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

***The deadline for filing proofs of claim in this case was October 27, 2014.  The Deadline for filing governmental proofs of claim in this case was February 3, 2015.***

### 2. *What Is an Impaired Claim or Impaired Equity Interest*

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in class that is *impaired* under the Plan. As provided in Bankruptcy Code §1124, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

### 3. *Who Is Not Entitled to Vote*

The holders of the following five (5) types of claims and equity interest are not entitled to vote:

- Holders of claims or equity interests that have been disallowed by an order of the Court.
- Holders of other claims or equity interests that are not "allowed claims" or "allowed equity interest" (as discussed above), unless they have "allowed" for voting purposes.
- Holders of claims or equity interest in unimpaired classes.
- Holders of claims entitled to priority pursuant to Bankruptcy Code §§507(a)(2), (3), and (8).
- Holders of claims or equity interests in classes that do not receive or retain any value under the Plan.
- Administrative Expenses.

***Even if you are not entitled to vote on the Plan, you have the right to object to confirmation of the Plan and the adequacy of the Disclosure Statement.***

### 4. *Who can Vote in More Than One Class*

A creditor whose claim has been allowed in part as a secured claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

## B. Votes Needed to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless: (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class; and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes.

### 1. *Votes Necessary for a Class to Accept the Plan*

A class of claims accepts the Plan if both of the following occur: (1) holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan; and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their vote to accept the Plan.

### 2. *Treatment of Nonaccepting Classes*

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner prescribed by Bankruptcy Code §1129(b). A plan that binds nonaccepting classes is commonly referred to as a "cram down" plan. The Bankruptcy Code allows the Plan to bind nonaccepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of Bankruptcy Code §1129(a)(8), does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

The treatment of creditors of Class 3 is fair and reasonable because it is in excess of any recovery those claimants would receive pursuant to liquidation under chapter 7 of the Bankruptcy Code. Additionally, although creditors of Class 1 and 2 are receiving no distribution from the estate, and instead receiving repayment from an independent source, i.e.: the insurance proceeds, treatment of Class 3 is reasonable.

Although Mr. Steeneck, an equity interest holder of Class 4, is keeping his interest in the Debtor, it does not affect the feasibility of Plan. Particularly, pursuant to the absolute priority rule, no holder of a junior class of creditors can receive any rights on their claims unless all senior claimants have been paid in full. Although the treatment of Class 4 does not comply with the absolute priority rule, it does fall within the "new value corollary", under which the objection of an impaired senior class does not bar a junior class from receiving or retaining property interest in the reorganized Debtor if they contribute new capital in money or money's worth, reasonably equivalent to the property's value, and necessary for a successful reorganization. Mr. Steeneck seeks to retain his equity interest and contribute "money or money's worth" in the form of needed capital to the Debtor in an amount reasonably equivalent to the value of the equity interest sought to be retained. To the extent there is not sufficient money to make an initial distribution, including the payment of administrative creditors, Mr. Steeneck will pay such amounts personally. Mr. Steeneck has already committed to pay not less than $20,000.00 towards the administrative claims.

***You should consult your own attorney if a "cram down" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

### C. Liquidation Analysis

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in liquidation under Chapter 7 of the Bankruptcy Code. A liquidation analysis is attached to this Disclosure Statement as **Exhibit B**.

### D. Feasability.

The Court must find that confirmation of the Plan is not likely to be followed by liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

1. *Ability to Initially Fund Plan*

The Plan Proponent believes that the Debtor will have enough cash on hand on the effective date of the Plan to pay all the claims and expenses that are entitled to be paid on that date.

2. *Ability to Make Future Plan Payments and Operate Without Further Reorganization*

The Plan proponent must also show that it will have enough cash over the life of the Plan to make the required Plan payment.

The Plan proponent has provided projected financial information. Those projections are listed on **Exhibit E**.

The Plan proponent's financial projections show that the Debtor will have an aggregate annual cash flow, after paying operating expenses and post-confirmation taxes, of approximately $5,000 per year. The final Plan payment is expected no later than five (5) years after the effective date of the Plan.

***You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.***

## V. EFFECT OF CONFIRMATION OF THE PLAN

### A. Discharge of the Debtor

On the effective date of the plan, the Debtor shall be discharged from any debt that arose before confirmation of the plan, subject to the occurrence of the effective date, to the extent specified in Bankruptcy Code §1141(d)(l)(A), except that the Debtor shall not be discharged of any debt: (i) imposed by the Plan; (ii) of a kind specified in Bankruptcy Code §1141(d)(6)(A) if a timely complaint was filed in accordance with Bankruptcy Rule 4007(c); or (iii) of a kind specified in Bankruptcy Code §1141(d)(6)(B). After the effective date of the Plan, any claims against the Debtor will be limited to the debts described in clauses (i) through (iii) of the preceding sentence.

### B. Modification of the Plan

The Plan proponent may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or revoting on the Plan.

The Plan proponent may also seek to modify the Plan at any time after confirmation only if: (1) the Plan has not been substantially consummated; and (2) the Court authorizes the proposed modifications after notice and a hearing.

## C. Final Decree

Once the estate has been fully administered, as provided in Bankruptcy Rule 3022, the Plan proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case. Alternatively, the Court may enter such final decree on its own motion.

Dated: June 3, 2015

**ADVANCED CHIMNEY, INC.**
Debtor and Debtor-In-Possession

By: _____
Michael Steeneck
President

**MACCO & STERN, LLP**
Attorneys for the Debtor

By: _____
Michael J. Macco
135 Pinelawn Road, Suite 120 South
Melville, New York 11747
(631) 549-7900